Cella **GUTIERREZ**, et al., Plaintiffs,

v.

**Charles J. GIVENS, Jr.,
et al., Defendants.**

**No. CIV. 97–1218–B (LAB).**

United States District Court,
S.D. California.

April 3, 1998.

1078

Edward M. Gergosiar, San Diego, CA, for Plaintiffs.

James E. Foster, Orlando, FL, for Defendants.

**ORDER DENYING DEFENDANT COLONIAL BANK'S MOTIONS TO DISMISS AND MOTION TO COMPEL MORE DETAILED RICO CASE STATEMENT**

BREWSTER, District Judge.

### I. Case Type and Jurisdiction

This case is a class action brought on behalf of all class-member judgment creditors in the "Gutierrez Class," as certified in an earlier California state court action and by this Court. The class members seek to pursue their remedies against defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 and California statutory and common law. Plaintiffs seek treble damages, costs, and attorneys' fees. The Court has subject matter jurisdiction over RICO suits pursuant to 18 U.S.C. § 1964(c), and over the state law claims through supplemental jurisdiction under 28 U.S.C. § 1367.

### II. Background

There are four named plaintiffs and twenty-one defendants. The named plaintiffs and the approximately 29,000 class members

were members of a state class action suit who obtained judgment against Defendant Charles J. Givens for false statements and misinformation regarding membership in the Charles J. Givens Organization, Inc. Of the twenty-one defendants, eleven are people and ten are business entities or trusts. The individual defendants are Givens and five of his family members, four of his attorneys, and his accountant. The organizational defendants include Colonial Bank f/k/a Southern Bank of Central Florida and ten holding companies or trusts allegedly controlled by Defendants. Plaintiffs allege that all twenty-one Defendants participated in a broad conspiracy to protect Givens' alleged millions of dollars of assets from the judgment and other legitimate debts.

During the fall of 1997, four groups of defendants moved to dismiss Plaintiffs' complaint for failure to state a claim upon which relief can be granted pursuant to FED. R. CIV. P. 12(b)(6) and for failure to plead fraud with particularity pursuant to FED. R. CIV. P. 9(b). Defendant Colonial Bank submitted additional motions to dismiss for lack of personal jurisdiction and improper venue, and moved for a more definite RICO case statement. On November 5, 1997, the Court granted Colonial's motion to dismiss for lack of personal jurisdiction, but provided Plaintiffs leave to amend their complaint. Colonial's other motions were dismissed as moot. The Court denied all other motions by the other defendants, finding that Plaintiffs had stated a cause of action under RICO and California state law. The Court also certified the proposed class action pursuant to Fed.R.Civ.P. 23. On December 15, 1997, Plaintiffs filed a First Amended Complaint ("FAC") repeating the initial allegations and realleging jurisdiction over Colonial Bank. On January 30, 1998, Colonial moved to dismiss the FAC for lack of personal jurisdiction, improper venue, failure to state a claim for which relief can be granted, and failure to plead fraud with particularity. In the alternative, Colonial moved to compel a more definite RICO case statement pursuant to Local Rule 11.1.

The class includes all current or former California residents who purchased memberships in the Charles J. Givens Organization, Inc. between May 5, 1986 and March 17, 1993, and who did not opt out of the class action in California Superior Court entitled *Cella Gutierrez, et al. v. Charles J. Givens Organization, Inc., et al.*, Case No. 667169 (Super. Ct., San Diego Cty.) The class in that action claimed that Givens defrauded them through negligent misrepresentations and violated California's Consumer Legal Remedies Act and other statutory and common law provisions. Members paid significant membership fees to join the Givens Organization. According to Plaintiffs' FAC, new memberships were sold for $295–998, dues ranged from $80–129 per year, the fee for the four-day real estate seminar ranged from $495–1695, and the prices for tax consulting were between $299 and $570. Plaintiffs allege that, by the end of 1994, the Organization had sold more than 600,000 memberships nationwide and enjoyed annual revenues of "several hundred million dollars" from its seminars and other products.

On July 22, 1996, the Superior Court, acting upon the jury's verdict, entered a judgment against Givens personally in the amount of $9,438,027 in compensatory damages, $4,719,013.50 in punitive damages, and $2,889,551.56 in costs and attorneys' fees, for a total liability of $17,046,592.06. Statutory interest continues to accrue at a rate of 10% per annum on the judgment and costs pursuant to C.C.P. § 685.010(a). The state court enjoined Givens from transferring, encumbering or selling any personal assets, and permitted expenditures only for ordinary, reasonable personal expenses and for attorneys' fees. Givens now claims that he has no assets from which to pay the judgment. On November 5, 1997, the state court found that Givens had repeatedly violated the injunction. The court held Givens in contempt, fining him $3000 and sentencing him to fifteen days in jail.

In 1990, a civil suit entitled *Beadle v. Charles J. Givens, et al.*, was commenced in the U.S. District Court for the Northern District of Iowa. (Civ. No. C90–143). The suit was apparently founded upon alleged misleading statements made by and on behalf of Givens that led individuals to drop

uninsured motorist coverage. Similar lawsuits were filed in other states in 1992 and 1993. Plaintiffs allege that, at some point in 1991 or 1992, Defendants recognized Givens' and the Organization's vulnerability to judgment creditors, and began to conspire to place Givens' assets beyond the reach of these anticipated creditors.

Plaintiffs' FAC cites numerous transactions and alleged schemes as part of the conspiracy. The FAC alleges the involvement of each individual defendant, and provides dates and dollar amounts of many transactions and references specific documents.

Defendant Colonial Bank f/k/a Southern Bank of Central Florida is a financial banking institution located in Orlando, Florida, Givens' base of operations. Plaintiffs allege that the bank was formed in 1988 by "Givens and his confederates." The FAC alleges that Givens controlled the bank, directly owning the state-allowed maximum 25% of the outstanding shares and controlling substantial additional shares through individuals, including co-defendants Tedder and Givens' children, who held stock in their names on Givens' behalf. Givens allegedly conspired with current bank chairman Don Prewitt to nominally divest himself of some of his interests in the bank in response to a state investigation of his illegal ownership. However, Plaintiffs allege that "Givens repeatedly represented to the public that he owned Southern Bank, and an indicia of his ownership and control was his ability to place confederates in positions of domination and control at the bank."

Plaintiffs contend that with Givens' "illegal control of and Prewitt in place at Southern Bank, Givens was free to operate his money-transferring machine, unfettered by the constraints of government regulators or otherwise independent bank officers. By 1990, Southern Bank had joined the conspiracy to transfer Givens' assets beyond the reach of his creditors. Virtually all of the revenues received by the [Givens] Organization or Givens went into Southern Bank and were thereafter improperly transferred from the bank to various foreign entities and other members of the asset protection scheme."

The FAC therefore alleges that "[b]ecause of Givens' interest in and control of Southern Bank, Southern Bank knew of the fraudulent purpose for the asset transfers and facilitated those transfers."

## III. Analysis

### A. Personal Jurisdiction

Colonial moves to dismiss the FAC against it for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). Plaintiffs' first complaint rested its jurisdictional allegations against Colonial Bank solely upon RICO's nationwide service of process provision. Plaintiffs argued that personal jurisdiction may be invoked under RICO's provisions for nationwide service of process, and that this Court may exercise *in personam* jurisdiction directly by such service, pursuant to FED. R. CIV. P. 4(e) and RICO § 1965(b). However, in their first complaint, Plaintiffs failed to satisfy the requirements necessary to invoke § 1965(b), as set forth by *Butcher's Union Local No. 498, United Food and Commercial Workers et al. v. SDC Investment, Inc., et al.*, 788 F.2d 535, 539 (9th Cir.1986). Therefore, the Court found that it "cannot exercise personal jurisdiction over Colonial Bank unless Plaintiffs either satisfy the conditions of *Butcher's Union* or establish the requisite jurisdictional facts regarding Colonial's contacts with California."

Plaintiffs' FAC alleges that the Court may properly exercise personal jurisdiction over Colonial on both grounds. If personal jurisdiction may be established under traditional minimum contacts analysis, it will be unnecessary to evaluate RICO's supplemental provisions.

### 1. Standard of Law

The Ninth Circuit has established a two-step test for determining the propriety of asserting personal jurisdiction. First, the relevant state's long-arm statute must permit jurisdiction. Second, the exercise of jurisdiction must be consistent with the demands of due process. *Greenspun v. Del E. Webb Corporation*, 634 F.2d 1204, 1207 (9th Cir. 1980) (citations omitted). As to the first inquiry, California Civil Procedure Code § 410.10 provides that "a court of this state

may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." CAL. CIV. PROC. CODE § 410.10 (Deering 1991). Therefore, the "statutory limitations upon jurisdiction are coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court." *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1286 (9th Cir.1977) (internal quotation omitted). Therefore, California authorizes jurisdiction whenever the second inquiry, the demands of due process, is satisfied.

■ A defendant must have sufficient "minimal contacts" with the forum so that the Court's exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice." *Data Disc, Inc.*, 557 F.2d at 1287 (citing *International Shoe Company v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). When a defendant moves to dismiss a suit for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of making "a *prima facie* showing of jurisdictional facts." *Id.* at 1285–86. The required *prima facie* showing must be of either general or specific jurisdiction. To defeat a 12(b)(2) motion to dismiss, Plaintiffs need only demonstrate facts that if true would support jurisdiction over the defendant. *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir.1995).

■ General jurisdiction exists where a non-resident defendant's activities in the state are "substantial" or "continuous and systematic." *Data Disc, Inc.*, 557 F.2d at 1287.

The Ninth Circuit has articulated a three-prong analysis for determination of specific jurisdiction:

(1) The nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of conducting activities in the forum, thereby invoking the benefits and protections of its laws.

(2) The claim must be one which arises out of or results from the defendant's forum-related activities.

(3) Exercise of jurisdiction must be reasonable.

*Id.* In short, whether specific jurisdiction exists "turns on an evaluation of the nature and quality of the defendant's contacts in relation to the cause of action." *Id.*

**2. Analysis**

■ Plaintiffs allege that the Court may exercise specific jurisdiction because Colonial transferred at least $1,092,340 of Givens' assets in at least four wire transfers to other defendants or business associations owned by other defendants located in California. Plaintiffs allege that Colonial knowingly made these transfers as part of the asset protection conspiracy scheme set forth in the FAC. Plaintiffs also allege that defendants Tedder, Reiserer, and Chatsky, all California residents, maintained a law firm account with Southern Bank and deposited conspiratorial proceeds into those accounts, and "through which millions of dollars of Givens' assets were improperly funneled and fraudulently transferred out of the reach of Givens' creditors." Taking Plaintiffs' allegations as true, Colonial knew that it was engaging in business transactions with California residents for the purpose of defrauding other California residents of a judgment won in California state court. While Colonial's alleged knowledge of the illegal nature of the transactions may not be necessary to establish personal jurisdiction, See *Ballard v. Savage*, 65 F.3d 1495 (9th Cir.1995) (personal jurisdiction of bank established by relationships with California consumers, regardless of the extent of the bank's role in fraudulent conspiracy), it is clear in this case that the allegations of knowledge and active involvement support a finding that Colonial purposefully availed itself of California jurisdiction (knowledge of contacts helps to establish purposeful availment, *Ballard*, 65 F.3d at 1500).

Colonial alleges that it does not have sufficient contacts with California to constitute purposeful availment. The affidavit of bank vice president Sharyn Dickerson declares that the bank does not have any offices or

employees in California; that it does not maintain any banking relations with any California bank; and that it does not advertise or otherwise attempt to solicit business in California. The affidavit admits that the bank may have engaged in routine banking operations in California such as check clearing and wire transfers, and it does not deny the allegations that Givens controlled the bank or that Tedder, Reiserer, and Chatsky maintained an account used to funnel Givens' assets. Colonial does not provide information as to the existence or lack thereof of depositors and outstanding loans in California. Colonial relies on two cases, both pre-*Ballard: Resolution Trust Corp. v. First of America Bank,* 796 F.Supp. 1333 (C.D.Cal. 1992) and *E.I.C., Inc. v. Bank of Virginia,* 108 Cal.App.3d 148, 166 Cal.Rptr. 317 (1980). These cases and cases cited within describe a few situations in which courts have been reluctant to establish jurisdiction over a financial institution simply because it wired funds into a state, or had a small number of forum depositors, or participated in interstate banking techniques. These cases stand for the general proposition that typical banking activities in this interstate banking age do not automatically subject all banks to general jurisdiction in all states. See *Resolution Trust Corp. v. First of America Bank,* 796 F.Supp. at 1335–1336 & n. 2–5.

While *Ballard* might not overrule these cases, it does signal the low threshold required to establish purposeful availment by a bank. In *Ballard,* the Ninth Circuit reversed a finding of lack of personal jurisdiction over an Austrian bank. The bank did not have any offices or employees in the United States. While the Court found that a substantial percentage of the bank's customers were U.S. residents, it did not make specific findings as to the percentage located in California. *Ballard* cited a Third Circuit case in which the court upheld a finding of general jurisdiction over a bank whose only contacts with the forum state were 0.066% of its depositors, 0.071% of its outstanding loan balance, and a zero-balance account maintained at a forum bank to clear checks cashed in the forum state. *Ballard,* 65 F.3d at 1499, *citing Provident Nat'l Bank v. California Federal Sav. & Loan,* 819 F.2d 434, 436–438 (3rd Cir.1987). The *Ballard* court noted that these limited contacts were found in that case to be sufficient to establish general jurisdiction, and that the specific jurisdiction requirement of purposeful availment is a "much lower" standard. *Id.*

Furthermore, Colonial's situation is distinguishable even from the pre-*Ballard* cases. First, the earlier cases typically involved general, rather than specific, jurisdiction. *Ballard* specifically distinguished its case from *E.I.C.* on that ground. 65 F.3d at 1499–1500. In this case, Colonial is alleged to have knowingly engaged in fraudulent transactions with California co-conspirators. The alleged transfers to and receipts from California may have been minimal (although they did exceed $1 million), but they were purposefully directed to the California co-defendants, and the transactions themselves are part of the wrong alleged by Plaintiffs.

Plaintiffs allege that Givens effectively controlled Colonial at the time these transactions occurred. While Colonial attempts to characterize the $1 million wired to California and the "millions" of dollars cycling through the Tedder/Reiserer/Chatsky account as a minor and ordinary business banking relationship, taking as true Plaintiffs' allegations, these transactions would have been of great importance to the bank and its *de facto* leader. Economic substance, not formality, is the proper gauge for determining a defendant's contacts with the forum state. *Haisten v. Grass Valley Medical Reimbursement,* 784 F.2d 1392, 1398 (9th Cir.1986). To implement the alleged scheme so important to Givens, Colonial allegedly engaged knowingly in fraudulent transactions with Givens' key asset protection advisor, Tedder, a California resident. Therefore, under this view, Colonial clearly purposefully availed itself of California jurisdiction.

Colonial is also subject to personal jurisdiction in California in this case because it is alleged to have intentionally acted in a manner that caused effect in California. Jurisdiction may be established under the "effects" test established in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). "Personal jurisdiction can be predi-

cated on (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *Core–Vent Corp. v. Nobel Industries,* 11 F.3d 1482 (9th Cir. 1993). Courts have applied the "effects test" cautiously, particularly when a defendant's contacts with a forum state are remote. *Id.* However, application of the test is appropriate in this case. According to Plaintiffs' allegations, Colonial's California transactions were deliberate and intentional acts in furtherance of an illegal conspiracy to purposefully defraud 29,000 Californians of a judgment duly awarded by a California state court. Although most transactions were committed prior to the entry of judgment in that case, the Court has already determined, in its November 5, 1997 order, that Defendants knew or should have known that their actions would later injure judgment creditors in California, and that in fact they were done for that express purpose. In short, Colonial's actions were allegedly committed for the express purpose of defrauding a large class of California residents. Taking the allegations as true, the bank should reasonably expect the be hailed into court in California.[1] Therefore, Colonial's activities related to California are sufficient to constitute purposeful availment.

The California contacts created by Colonial's interactions with the California defendants are a clear part of the conspiracy alleged in the FAC. Therefore, Plaintiffs' claims arise out of and are in part a of result of the defendant's forum-related activities.

The final factor to consider for establishing personal jurisdiction is reasonableness. Courts presume that an otherwise valid exercise of specific jurisdiction is reasonable. *Ballard,* 65 F.3d at 1500. To avoid jurisdiction on the grounds that it is unreasonable, Colonial must "'present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)) (emphasis original). Colonial has failed to satisfy this high standard. Colonial's burden of defending this suit in California is no greater than would be Plaintiffs' burden in litigating in Florida. California has a very strong interest in providing a forum for 29,000 of its residents to protect a state court judgment won in California courts. Maintaining the suit would not interfere with Florida's sovereignty, which is irrelevant for the federal RICO claims and is a non-factor as to the state law Uniform Fraudulent Transfer Act (UFTA) claims, since both Florida and California have adopted the UFTA. Finally, judicial efficiency is best served by the consolidation of Plaintiffs' causes of action in this single suit. Plaintiffs allege that if their suit against Colonial is dismissed for lack of personal jurisdiction or improper venue, they will continue to maintain this suit in California and would file a second class action against Colonial in the Middle District of Florida.

For the foregoing reasons, Colonial's motion to dismiss for lack of personal jurisdiction is denied.

**B. Venue**

■ Colonial argues that this action should be dismissed, or transferred to the Middle District of Florida, based upon the doctrine of forum non conveniens. The Supreme Court has ruled that the "transfer of venue function of the forum non conveniens doctrine has been superseded by statute, see 28 U.S.C. § 1404(a) ... and [is now appropriately used only] in cases where the alter-

1. Plaintiffs argue that the Court may exercise personal jurisdiction over Colonial because the bank participated in a conspiracy that was intended to cause tortious effects in California, citing *St. Joe Paper Co. v. Superior Court,* 120 Cal.App.3d 991, 997–998, 175 Cal.Rptr. 94 (1981) and *Maricopa Co. v. American Petrofina, Inc.,* 322 F.Supp. 467, 469 (N.D.Cal.1971). However, the Supreme Court has subsequently ruled that an individual's connection with the forum state must be examined independently to determine jurisdiction. *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). See *Karsten Manufacturing Corp. v. United States Golf Association,* 728 F.Supp. 1429, 1434 (D.Ariz.1990) (rejecting the *Petrofina* theory for establishing personal jurisdiction over conspirators). The difference between *Calder's* effects test and the conspiracy test is that, under the effects test, each individual defendant must know that their individual actions will cause injuries in the forum state.

native forum is abroad." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 116 S.Ct. 1712, 1724, 135 L.Ed.2d 1 (1996) (internal quotation and citations omitted). Therefore, the doctrine does not apply in this case where an American defendant seeks to transfer the case to Florida.

Colonial's motion should be denied even if it is construed to rest upon an improper venue argument. Transfers of venue are governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Whether to transfer venue under 28 U.S.C. § 1404(a) is a matter within this court's discretion. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir.1986).

The court must balance the convenience of the parties and witnesses and the interests of justice in determining whether the case should be transferred. "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (internal quotation omitted). Among the factors which the court may consider include a plaintiff's choice of forum and the interests of justice. *See, e.g., Decker Coal Co. v. Commonwealth of Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986).

The Plaintiff class is comprised of approximately 29,000 California residents. California has a very strong interest in this litigation because it involves an alleged conspiracy to undermine a valid judgment of a California state court. Furthermore, the Court notes that Givens has already been found in contempt by the state court for actions related to those alleged in the FAC. Plaintiffs have already expended considerable effort in obtaining the state court judgment, and it would not serve the interests of justice to require them to travel to Florida to prosecute these claims.

Therefore, Colonial's motion to dismiss for improper venue is denied.

## C. Colonial Bank's 12(b)(6) Motion to Dismiss

The Court's November 5, 1997 Order held that Plaintiffs' original complaint stated a cause of action under RICO and UFTA against all other defendants. Because the FAC's allegations are substantially similar to the original complaint, the Court will not readdress questions answered by the previous order. See *Gutierrez v. Givens*, 989 F.Supp. 1033 (S.D.Cal.1997). However, Colonial raises additional arguments unique to its defense that must be addressed.

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims in the complaint. This court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them, and must construe the complaint in the light most favorable to plaintiff. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995). The court need not, however, accept every allegation in the complaint as true; rather, the court "will examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir.1992) (citation omitted).

### 1. Motion to Dismiss all Claims

Before challenging the individual counts of Plaintiffs' FAC, Colonial seeks to have the entire suit against it dismissed. Colonial argues that it cannot be liable for any of the acts of the alleged conspiracy because it acted only as a conduit for the fraudulent transfers. Even if that statement were true, it misstates Plaintiffs' FAC. Plaintiffs allege that Colonial was an active participant in the conspiracy, not an innocent, unknowing conduit. Therefore, Colonial is not necessarily immune from liability.

Colonial argues that Givens' knowledge cannot be imputed to it under the theory that Givens controlled the bank. However, Plaintiffs allege that Colonial itself had knowledge of the asset protection scheme, and that it participated in the operation and manage-

ment of the alleged racketeering scheme. Therefore, accepting Plaintiffs' allegations as true, it is not necessary to impute Givens' knowledge to the bank.

## 2. RICO

Congress enacted the Racketeer Influenced and Corrupt Organizations Act ("RICO") with the specific intent to "thwart the organized criminal invasion and acquisition of legitimate business enterprises and property." *Oscar v. University Students Co-operative Assn.*, 965 F.2d 783, 786 (9th Cir.1992). Section 1964(c) provides that:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ....

18 U.S.C. § 1964(c). However, federal courts have established that RICO was "intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar*, 965 F.2d at 786. ·

The substantive provision of RICO, § 1962, describes the prohibited activities and provides for four different causes of action. Section 1962(a) provides that:

> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Section 1962(b) provides a cause of action for acquiring or maintaining an interest in or control of any enterprise engaged in interstate commerce using funds from racketeering activity. Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs a pattern of racketeering activity[.]

18 U.S.C. § 1962(c). Finally, section 1962(d) provides a cause of action for conspiring to violate any of the provisions in subsections (a), (b), or (c). The first two counts of Plaintiffs' FAC allege causes of action under subsections (a), (c) and (d) of § 1962.

To state a cause of action under RICO, Plaintiffs must establish (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to the Plaintiffs' business or property by the conduct constituting the violation. *See Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). RICO, in pertinent part, defines "racketeering activity," as "any act or threat ... which is indictable" under an enumerated list of offenses codified in Title 18 of United States Code and "which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). A pattern of racketeering activity exists when a person commits two or more specified acts ("predicate acts") that have sufficient continuity and relationship so as to pose a threat of continued criminal activity. See, e.g., *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir.1991). From the list of predicate acts, Plaintiffs allege that Defendants' liability may be invoked from indictable violations of the following sections of Title 18: § 1341 (mail fraud), § 1343 (wire fraud), § 1952 (interstate or foreign travel or use of interstate commerce in aid of racketeering enterprises), § 1956 (money laundering), and § 2314 (interstate transportation of stolen property).

Plaintiffs allege injury because they have been unable to collect the $14.1 million judgment against Givens.

After arguing the requisite racketeering activity and injury, Plaintiffs' Count One asserts that Defendants violated § 1962(a) and (d) by conspiring to derive and deriving substantial proceeds from their racketeering activities and conspiring to use or invest or using or investing such proceeds in the operations of what Plaintiffs allege to be an association-in-fact enterprise organized to

execute Givens' "Asset Protection Plan." Furthermore, Plaintiffs allege that enterprise assets were invested into companies such as Group of Companies that engaged in interstate commerce by conducting Givens' seminars and other activities. Count Two alleges that Defendants violated § 1962(c) and (d) by conducting and participating in the conduct and affairs of the association-in-fact enterprise through the pattern of racketeering described above, and by conspiring to do the same.

The Court determined in its November 5, 1997 Order that Plaintiffs had, as a general matter, adequately stated its two causes of action under RICO subsections § 1962(a), (c), and (d), based upon predicate act violations of §§ 1341, 1343, 1952 and 1956.[2] Plaintiffs allege that Colonial was a knowing and active participant in coordinating fraudulent wire transfers and laundering Givens' assets. Therefore, at this stage of litigation, the Court will not dismiss allegations that Colonial committed predicate act violations of §§ 1341, 1343, 1952 and 1956.

### a. § 1962(a)

Colonial argues that the first cause of action pursuant to § 1962(a) must be dismissed because Plaintiffs do not allege that it received any income from the alleged fraud, or that it invested any such proceeds into interstate commercial activities. While their argument is not without technical merit, Plaintiffs do allege that Colonial acted as an *inside* player in the operation and management of Givens' schemes. Plaintiffs allege that the bank operated as a pawn of Givens' operations, and that bank chairman Prewitt received benefits from the Givens operation and that Prewitt's son was given a job in the Givens Organization. Therefore, it is reasonable to infer that the bank received beneficial income, at least indirectly, from the alleged racketeering activities. Resulting income was likely invested in the bank's operations, which clearly qualify as affecting interstate commerce. Plaintiffs also allege that money was invested into corporations such as defendant Group of Companies. Taking Plaintiffs' claims as true, the Court cannot dismiss the § 1962(a) claim, or the corresponding § 1962(d) claim, against the bank.

### b. § 1962(c)

To be liable under § 1962(c), each individual defendant must be shown to have "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). The *Reves* test is intended to protect outsider, professional service providers who might assist a racketeering enterprise. *See Handeen v. Lemaire*, 112 F.3d 1339, 1347–1351 (8th Cir.1997) (reversing a district court's entry of summary judgment for defendant law firm; the *Reves* test does not protect a law firm that is alleged to have helped execute a scheme to hide assets from a judgment creditor, when it is at all possible to infer such level of involvement from complaint).

The cases upon which Colonial relies are premised upon the existence of a bank that is independent of alleged wrongdoers. In this case, taking Plaintiffs' allegations as true, Colonial was not operating as a legitimate, independent financial institution, but instead was an inside actor, or even a pawn, of the Givens' operation. If these allegations are not supported later in this case, Colonial may have a valid defense to the § 1962(a) claims. In the meantime, however, it cannot hide behind protections designed for independent financial service institutions. Therefore, the Court cannot dismiss the § 1962(c) claim, or the corresponding § 1962(d) claim, against the bank.

### 3. UFTA

■ Count Three of Plaintiffs' FAC alleges that Defendants' Asset Protection Plan violated the Uniform Fraudulent Transfer Act ("UFTA"), codified in California as CAL. CIV. CODE § 3439, which provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,

**2.** The Court's November 5, 1997 Order stated that Plaintiffs' claim of predicate acts under § 2314, transportation of stolen property, appears to lack merit because the money at issue was not stolen. This finding is equally applicable to Colonial.

whether the creditor's claim arose before or after the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:

(a) With the intent to hinder, delay, or defraud any creditor of the debtor. . . .

CAL. CIV. CODE § 3439.04 (1996).

Colonial argues that none of the remedies supplied by UFTA could apply to it. Admittedly, the typical remedy in UFTA is invalidation of a transfer and a return of money to a debtor to satisfy the debtor's debts. However, UFTA also includes a broad remedial provision, § 3439.07(a)(3)(C), which permits a court, "[s]ubject to applicable principles of equity," to award "[a]ny other relief the circumstances may require." Colonial argues that this provision cannot apply to it because it is subject to the limitations of § 3439.08, and that § 3439.08(b) limits liability to transferees. However, the limitations of § 3439.08(b) apply only to remedies entered pursuant to § 3439.07(a)(1), avoidance of transfers. The limitation does not apply expressly to § 3439.07(a)(3)(C).

Plaintiffs face a challenge in establishing the liability of a non-transferee under UFTA. Were there not serious allegations of complicity by the bank, the Court would probably dismiss this claim. However, Colonial's motion has not established that no set of facts could state a claim for relief in light of § 3439.07(a)(3)(C)'s broad remedial provision. Therefore, its motion to dismiss the UFTA claims is denied.

### 4. Civil Conspiracy

 Colonial moves to dismiss the conspiracy claim against it, arguing that Plaintiffs have not alleged sufficient involvement by the bank to state a claim upon which relief can be granted. Colonial's motion concedes that "Plaintiffs were not required to plead specific or overt acts, as a 'conspiracy may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances,'" quoting *Greenwood v. Mooradian*, 137 Cal.App.2d 532, 538, 290 P.2d 955 (1955) (citing *Anderson v. Thacher*, 76 Cal.App.2d 50, 72, 172 P.2d 533 (1946)). Citing *Cully v. Bianca*, 186 Cal.App.3d 1172,

1176, 231 Cal.Rptr. 279 (1986), Colonial correctly notes that some showing of an agreement or at least a tacit understanding must be made in the complaint. However, *Cully* explicitly provides that a third party to a tort can be liable when he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . . ." *Id.* Plaintiffs have specifically alleged that Colonial knew of the fraudulent purpose of the Givens transactions and that the bank's cooperation substantially enabled the objectives of the conspiracy. The Court finds that a triable issue of fact exists as to whether Colonial may be found liable for a civil conspiracy to violate the UFTA.

### D. Pleading of Fraud with Particularity and RICO Case Statement

When a complaint alleges fraud, the circumstances constituting fraud must be stated with particularity. Fed.R.Civ.P. 9(b); *In re Stac Electronics Sec. Litig.*, 82 F.3d 1480, 1486–87 (9th Cir.1996). The purpose of this rule is to "give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints as a pretext for the discovery of unknown wrongs." *Id.* at 1487 (internal quotation omitted).

Before discovery, Plaintiffs cannot aspire to know all of the details of an alleged fraud against them. The pleading requirement is designed to thwart baseless complaints and fishing expeditions, and does not require dismissal of complaints in which allegations, if true, start to paint a real picture of actionable fraud. As the Court determined in its November 5, 1997 order and finds equally true today, Plaintiffs present extensive allegations, often complete with names, dates, and amounts in question. These illustrations satisfy the heightened pleading requirement of Rule 9(b). Therefore, Colonial's motion to dismiss pursuant to Rule 9(b) is denied.

Colonial also moves for a more definite RICO case statement pursuant to Local Rule 11.1. Colonial argues that the statement is deficient because it does not give complete answers to all of the questions. In its November 5, 1997 Order, the Court found that

the purposes of the case statement requirement, notice to the defendant and the filtering out of meritless complaints, have been satisfied. Therefore, this motion is denied.

Colonial argues that a more definite statement is required to clarify the actions of each individual defendant, as opposed to generalized allegations regarding the conspiracy as a whole. The bank points to the Court's statement in the November Order that, "[w]hile some Defendants may have been more or less culpable, or even completely innocent, the complexity of [Plaintiffs'] allegations makes it difficult to differentiate between them on the record before the Court." However, the Court was not suggesting that the allegations were inadequate to proceed; it was merely recognizing the reality that, at the motion to dismiss stage of litigation, a plaintiff may make a sufficient allegation against a defendant even when that defendant later may be absolved. Furthermore, allegations of Colonial's involvement are stated with more precision than those of certain other Defendants.

## IV. Conclusion

The Court hereby denies Colonial's motions to dismiss for lack of personal jurisdiction, improper venue, failure to state a claim for which relief can be granted, and failure to plead fraud with particularity. The Court also denies Colonial's motion to compel a more detailed RICO case statement.

IT IS SO ORDERED.